WhitakeR, Judge,
dissenting:
I cannot agree to the court’s disposition of this case.
Congress has vested in the several Secretaries of the Armed Forces the authority to determine whether an officer is entitled to be discharged for physical disability and thus draw increased retirement pay. To discharge this responsibility, *283 the Secretaries have set up Disposition Boards and Retiring Boards. When it appears an officer is probably entitled to such retirement, he is first sent before a Disposition Board for the purpose of ascertaining whether his physical condition merits consideration of his case by a Retiring Board. When the Retiring Board considers his case and determines he is not entitled to such retirement, and the Secretary approves its action, that is the end of the matter. No court is given jurisdiction to review the action of the Board and the Secretary.
But, since we have jurisdiction of actions founded on any law of Congress and the officer claims that he is entitled to disability retirement under the law, we have quite properly said that the claimant is entitled to a fair, and impartial application of the law to his case, and that if, instead, the Board and the Secretary act arbitrarily or capriciously, we have jurisdiction to determine the claimant’s rights under the law. But only where the claimant has been denied a fair and impartial consideration of his case do we acquire jurisdiction. Before a claimant can come here at ,all he must show his case has not had fair and impartial consideration by the Board set up by the Secretary to determine the matter, or a refusal to submit his case to such a Board. This Board is the Retiring Board.
Has plaintiff shown this ? Can he show it? He cannot. He cannot, because he himself, by his own act, prevented consideration of his case by this Board.
Had plaintiff permitted the Retiring Board to consider his case and had it acted arbitrarily or capriciously, plaintiff’s cause of action in this court would have then accrued. By refusing to go before the Board, by his own act, he cannot extend the period within which he must bring suit here or be barred from ever doing so.
This court decided otherwise in Harper v. United States, 159 Ct. Cl. 135, 310 F. 2d 405. As my concurring opinion on the denial of defendant’s motion for a rehearing (rendered January 11, 1963) shows, I was not satisfied with the Harper decision at the outset; and, upon further reflection, *284 I have come to the conclusion that that decision was erroneous and should be overruled.
I think the statute of limitations begins to run when a member of the armed services, after having been offered an opportunity to appear before a retiring board, refuses to appear before it. As I have said, the statute vests in the Secretary the authority to determine whether a person is entitled to disability retirement, and the Secretary acts through retiring boards. We held in Friedman v. United States, 159 Ct. Cl. 1, 810 F. 2d 381, cert. denied, 373 U.S. 932 (1963), that the action of the Secretary in that manner, or his refusal so to act, started the statute running. A subsequent appeal to the Correction Board did not extend the time within which suit could be commenced. That holding was grounded partly on the hypothesis that a person by his own act — an appeal to the Correction Board- — could not extend the statutory period for bringing suit. (Supra, p. 30.)
That policy was violated in Harper, and it is violated in the circumstances of this case. This plaintiff could have had his rights adjudicated in 1946, when the Army offered him a Retiring Board. He chose not to do so. Under the holding in this case, he is permitted to wait until 1957 — 11 years later — to claim, for the first time, that he was physically disabled at the time of his discharge and to ask for disability retired pay from the date of his discharge. Not only II years is he permitted to wait, but if his cause of action first accrued when the Correction Board denied his claim, as the majority holds, he may wait an additional six years before bringing suit upon his claim, 17 years in all.
Had he gone before the Retiring Board in 1946, which he could have done, and had that board declined to give him the right to retired pay, his cause of action would have accrued then, and had he not brought suit in this court within six years from that time, he would have been barred from doing so. But, by refusing to go before the board, the majority says, he extends the time when his cause of action accrues for 11 years and the time for initiating suit for 17 years.
*285 May a person by Ms own act tbns extend the statute of limitations? I do not think so. Yet, the result in this case accords to this plaintiff a self-starting statute of limitations, and this is something I believe the Friedman case intended to prevent.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a medical doctor and resident of the. State of New Jersey, was on
(a) June 12, 1935, upon graduation from New York University Medical School, appointed first lieutenant, Medical Corps, Officers’ Reserve Corps;
(b) September 26, 1939, promoted to captain, Medical Corps, Officers’ Reserve Corps;
(c) April 1,1941, transferred to the Inactive Reserve;
(d) May 26, 1942, honorably discharged by reason of physical disqualification because of incapacitating hay fever and asthma;
(e) March 1, 1944, appointed captain, Medical Reserves, Army of the United States;
(f) August 4, 1946, appointed captain, Medical Corps, Officers’ Reserve Corps;
(g) December 11, 1946, promoted to major, Army of the United States;
(h) February 21,1947, promoted to major, Medical Corps, Officers’ Reserve Corps;
(i) November 2,1948, transferred to the Inactive Reserve; and was on
(j) July 19,1951, honorably discharged from commissions as major, Army of the United States, and major, Medical Corps, Officers’ Reserve Corps.
2. Plaintiff had the following periods of active service as a commissioned officer:
(a) from June 17,1935 to December 1935 and
(b) from March 24, 1944 to September 15, 1946, when he *286 was discharged to inactive status, not due to physical disability.
3. In this suit plaintiff seeks disability retirement pay from September 15, 1946, the date of his discharge to inactive status, less disability compensation which he has received from the Veterans Administration.
4. (a) On December 22, 1943, plaintiff signed a document of the General Dispensary, U.S. Army, the body of which reads as follows:
I, Harold GrubiN Aprl. MC

{Name) {Bank) {Component)

being desirous of entering upon active military service during the current emergency and being aware of the fact that I have the following physical defects:
A. History of attack of asthma in 1938 and in 1940 — none before or after.
B. Moderate fall type hayfever.
x
x
x
X
do hereby acknowledge the existence of the above mentioned physical defects, and request that I be placed upon extended active duty.
(b) A report dated December 23, 1943, of a physical examination given plaintiff by the United States Army Medical Corps contains the finding that plaintiff was permanently incapacitated for active service and that he was unfit for overseas duty because of his hay fever and asthma. The report contained the recommendation that plaintiff was able to perform limited service with a waiver of his hay fever and asthma.
(c) On March 1, 1944, plaintiff was temporarily appointed, and on March 23,1944, plaintiff entered active duty as captain, Medical Reserves, in the Army of the United States, for limited service only, unfit for overseas duty, with a waiver granted for plaintiff’s hay fever.
5. (a) On September 28, 1944, plaintiff was examined at Billings General Hospital, Fort Benjamin Harrison, Indiana, *287 by a Board of Medical Officers. The board made the following findings and recommendation:
Findings: After careful examination of the patient and all the records pertaining to the case, the Board finds
1. That the diagnosis is: (a) Asthma, seasonal, mild, caused by ragweed sensitivity. (b) Hay fever, seasonal, moderate, due to ragweed sensitivity. 1 a and b were not incurred in line of duty but existed prior to entrance on extended active duty and were not aggravated by the military service.
2. That because of 1 a and b this officer is permanently incapacitated from performing full military duty but is suitable for limited service, overseas.
Recommendation: The Board recommends that Harold Grubin, 0-330059, Captain, MC, be re-assigned from limited service, not overseas, to limited service, suitable for overseas service. This officer is unfit for duty with combatant troops but is capable of performing such duties as are required in a Station, Post or Camp complement, Service Command, or War Department overhead. He is suitable for overseas service as defined in current regulations.
(b) Shortly after the above findings and recommendation were made, plaintiff was ordered to the Philippine Islands, an area free from asthma and hay fever, and was stationed in the town of San Jose on the island of Mindoro.
6. (a) In June 1945 plaintiff, while in the Philippine Islands, suffered an onset of frequent liquid stools which occurred six to eight times daily and were accompanied by pain and cramping in the abdomen, slight nausea but no vomiting, and were followed by marked weakness and easy fatigue.
(b) On July 25,1945, plaintiff was admitted to the 165th Station Hospital, San Jose, Mindoro, where a series of tests were made for possible infection of the intestinal tract by a pathogenic parasite known as an amoeba, but all such tests were negative. Plaintiff was treated, however, for amoebic infection and for pain and spasm in the rectum and anus.
*288 (c) On August 12, 1945, plaintiff was released witli a finding that Ms condition had improved and a final diagnosis of enterocolitis, acute, moderately severe, cause undetermined. Enterocolitis is an inflammation of the small and large intestines.
(d) On September 1, 1945, plaintiff was examined at the Military Government Staging Area, Antipolo, where a diagnosis was made of colitis, catarrhal, chronic and fissure-in-ano. Colitis is an inflamation of the colon. Catarrhal means an excessive running off of mucus from the membranes. Fissure-in-ano is a split of the mucous membrane attached to the anus. A microscopic examination of plaintiff’s stools revealed that the examiner saw some kind of amoeba (parasite) which he thought was possibly either entameba histolytica, an amoeba causing dysentery disease, or entameba coli, an amoeba not causing dysentery disease. Plaintiff was treated for both amoebic and bacillary dysentery and was sent to the 80th General Hospital in Manila where he was received on the same date, September 1, 1945.
7. From September 1, 1945 until October 28, 1945, plaintiff was observed, tested, and treated at the 80th General Hospital in Manila.
(a) The initial diagnosis was as follows:
1. Entero-colitis, moderate, chronic, cause undetermined.
2. Hemorrhoids, internal and external, chronic, moderate, cause undetermined.
8. Lumbricoides and trichuris triehiura infection, gastro-intestinal tract.
Condition on Admission: Ambulatory.
Line of Duty: 1, 2, 8, 4 & 5 Yes.
(b) Plaintiff’s diarrheic condition resulted in a prolapse of the rectum, internal and external hemorrhoids, an anal fistula, cryptitis and papillitis, all of which caused severe burning pain and tension in the rectum. In a prolapse of the rectum a portion of the rectum falls out through the anus. Hemorrhoids are enlargements of the veins in the lower end of the rectum and are caused by diarrhea and excessive strain and stress of stool. An anal fistula is a little channeling under the mucous membrane, usually beginning above the anus in the rectum and burrowing out underneath the *289 skin external to the anus. It usually begins in a little abscess in the crypts of the lower rectum. Cryptitis is an infection and inflammation of a crypt. Papillitis is an inflammation of the anal papillae which are elevations surrounding the anal crypts.
(c) A hemorrhoidectomy and a fistulectomy were performed, as a result of which there has 'been a permanent narrowing of the anus which, together with plaintiff’s internal hemorrhoids, cause him frequent severe abdominal pain at the time or prior to the urge for a bowel movement.
(d) On one occasion roundworm and whipworm parasites were found in plaintiff’s stool. Sulfadiazine treatment was administered but was discontinued when it did not alter plaintiff’s symptoms.
(e) On October 20, 1945, a consultation report summarized plaintiff’s condition as follows:
Patient has had several months of loose watery stools. Onset is that of an acute Shigellosis [6] for which patient never received adequate treatment. Thorough investigation of lower bowel has revealed no evidence of organic pathology at this time. There has been no response to Sulphonamide therapy at this time. The improvement noted has been mostly due to bedrest and sedation. Believe condition at present is that of an irritable bowel. There is a mild neurotic overlay present in this patient. Believe that some of his symptoms are due to a rising anxiety that patient is beginning to exhibit over his condition. His number of daily B.M. 3-4 are not enough to cause the weakness. Recommend that patient be evacuated to the U.S. for further therapy inasmuch as do not believe patient will ever do effective duty again in this theater.
Entero colitis, moderate, cause undetermined, chronic.
8. (a) On October 28, 1945, plaintiff was boarded for evacuation to the United States. The diagnosis of his condition was:
1. Enterocolitis, moderate, chronic, cause undetermined.
2. Hemorrhoids, internal and external, chronic, moderate, cause undetermined.
*290 3. Lumbricoides and trichuris, trichiura infection, gastrointestinal tract.
4. Fistula, anal, moderate, chronic, cause undetermined.
5. Cryptitis, anal, chronic, moderate, cause undetermined.
LOD YES 1, 2, 3, 4, S.
(b)On November 27, 1945, plaintiff was admitted to the Station Hospital, Camp Haan, California, and was transferred to the U.S. Army General Hospital at Camp Edwards, Massachusetts, on December 4,1945.
9. From December 4, 1945 to March 5,1946, plaintiff was observed, examined, tested, and treated at the U.S. Army General Hospital at Camp Edwards, Massachusetts.
(a) The initial summary was “Diarrhea since May 1945. Since Oct. 1945 4^5 formed bowel movement daily. No diarrhea.” The working diagnosis or impression was “Dysentery, cause unknown.” The chief complaint was “Diarrhea unknown origin since May 1945.”
(b) The progress notes at the hospital, dated December 10,1945, read as follows:
Dec. 10, 1945.
Patient’s history reviewed, and patient examined, and found physically well enough to be granted 30 day leave.
(c) The progress notes at the hospital, dated January 25, 1946, disclose that no specific organisms were revealed in plaintiff’s stools.
(d) A clinical abstract of the General Hospital regarding plaintiff, dated February 8, 1946, reads in pertinent part as follows:
The patient is a 32 yr. old Medical Officer who was inducted 24 March 44. He is on limited service for hay fever.
In May 45 there was an onset of frequent liquid stools while in the Philippines. These occurred six to eight daily and were accompanied by pain and cramping in the abdomen. This lasted on and off until Sept 45. The stools were never bloody and never tarry. There was slight nausea but no vomiting. He developed a fistula in ano which was removed in Oct 45. Repeated stool examinations were negative except on one occasion when both lumbricoides and ascaris appeared. He was treated *291 for this but the diarrhea persisted. Proctoscopy in May 45 revealed a great deal of mucous but no other definite findings. In August 45, he had an acute proctitis. This recurred in Sept 45 but proctoscopy revealed a healed colitis. The patient was hospitalized in August 45 for fifteen days and again in Sept 45, at which time he was treated for amebic dysentery. He was given sulfa-guanidine and penicillin. The stools have gradually become more formed but have not cleared altogether. At present he is having three to five formed bowel movements daily. There is no soreness but very marked pruritus of anus. In 1936 there was onset of sneezing, lacrimation, nasal discharge and itching of the nose and eyes in mid August. The patient has had symptoms of this nature each year ever since that time. In 40 and again in 44, he had some mild wheezing and dyspnea.
The patient was admitted to the U.S.A. Gen. Hosp on 1 Dec 45. He was given a thirty day leave. On his return, he was given a complete medical workup. Repeated stools have been negative for ova and parasites and have showed only one plus occult blood. CBC normal. Urinalysis negative. An allergy workup revealed multiple sensitivities and a diagnosis of hay fever, moderate, due to ragweed and rhinitis, chronic, allergic, moderate, due to mixed allergens. Since in this hospital, the patient has had two proctoscopic examinations, the first one on 21 Jan 46, at which time a diagnosis of proctitis and papillitis with cause undetermined was made. Patient was given a low residue diet, mineral oil and nupercaine ointment inserted thru rectal tube, and a rectal dilatation. A second proctoscopic examination was done on 6 Feb 46, at which time a diagnosis of pruritus ani, mild, and proctosigmoiditis, cause undetermined was made.
I believe the patient should have further treatment and then, final evaluation.
(e) The progress notes at the hospital, dated February 23, 1946, read as follows:
There has been marked improvement since last proc-toscopy. It is possible that Sulfadiazine is clearing this condition.
10. (a) On February 27,1946, plaintiff was presented before the Disposition Board at the U.S. Army General Hos *292 pital at Camp Edwards. The clinical abstract reads in part as follows:
The patient was admitted to the U.S. Army General Hospital, Camp Edwards, on 1 December 1945. _ He was given a thirty day leave and on his return was given a complete medical work-up. CBC and_ urinalysis, normal. Repeated stools have been negative for ova and parasites and for blood. An allergy work-up reveals multiple sensitivities and a diagnosis of hayfever, due to ragweed, and rhinitis, chronic, due to mixed allergens, was made. Since in this hospital the patient has had three proctoscopic examinations. On each examination there has been marked improvement until the final examination on 20 February 1946 revealed a complete healing of the lesions in the lower bowel. Patient was placed on a low residue diet; mineral oil and nupercaine ointment inserted through i’ectal tube and rectal dilatation. He was given a course of sulfadiazine.
The patient is now presented before the Disposition Board for further consideration and final disposition.
DIAGNOSIS: 1. Playfever, moderate, due to ragweed.
2. Rhinitis, chronic, allergic, moderate, due to mixed allergens.
Lod: 1&2,No. EPTS.
3. Enterocolitis, moderate, chronic, cause undetermined.
Lod: 3, Yes.
Date of Okigin : May 1945.
Date of Inoafacitt: Inducted on permanent limited duty, final hospitalization, in September 1945.
(b) The board found that plaintiff became incapacitated for military duty on September 2, 1945, that plaintiff’s en-terocolitis originated in May 1945, was an incident to service, did not exist prior to entry on active duty, was permanently aggravated by active duty, and that plaintiff had received maximum hospital benefit. The board further found that the degree of plaintiff’s disability for military service was partial, permanent. The board stated (briefly in nontechnical language) that plaintiff’s disability was “Diarrhea and abdominal cramping pains”, and recommended that plaintiff “remain on permanent limited duty, and that he appear before an Army Retiring Board.”
*293 11. (a) Shortly after the Disposition Board at the U.S. Army General Hospital at Camp Edwards made its findings and recommendations, plaintiff signed a statement addressed to his commanding officer, the body of which reads as follows :
1. I have been informed that I am to be recommended for Permanent Limited Duty and that I can make a statement as to whether or not I desire to remain on active duty in a Permanent Limited Service capacity.
2. In view of the above paragraph I hereby make the following statement:
I (do not) desire to remain on active duty in a Permanent Limited Service status.
(b)On March 3, 1946, plaintiff’s ward officer signed a request for plaintiff’s transfer to Tilton General Hospital for appearance before a Retiring Board. On this date, however, plaintiff was ordered transferred to Halloran General Hospital, Staten Island, New York, for further observation, treatment, and disposition.
12. (a) On March 5,1946, plaintiff was admitted to Hal-loran General Hospital, Staten Island, New York. The hospital progress notes of this date read as follows:
Transferred from Camp Edwards tonight with diagnosis of enterocolitis, Hay fever and chronic rhinitis. Admit to medical service. No immediate medication needed.
(b) The hospital progress notes of March 6, 1946, read as follows:
At present time pt. having 3-5 formed stools daily c pruritis ani & mild soreness. There is occasional discomfort in lower abd. thru the day. Sometimes he will get a cramp & then will disappear 5-10 min after a B.M.
Record well summarized at Edwards. Case seems to be fairly well worked up but should have at least two more stool cultures.
(c) The hospital progress notes of March 13,1946, read as follows:
Ba enema normal. Stool studies are normal.
(d) On March 25, 1946, a Disposition Board met at the *294 hospital on plaintiff’s case. The clinical abstract contained in part the following:
Physical Examination: Blood pressure 120/80. Slight redness of the anus, otherwise the physical examination was within normal limits.
8fecial Studies: Stool cultures and search for parasites were once again repeated and these were always negative. A barium enema was done which showed no abnormalities.
Course in the Hospital: The patient only had a couple of studies done at this hospital since his workup was so complete at Camp Edwards and his stools remained at a frequency of 2-4 formed stools daily. Otherwise there were no specific complaints.
Interpretation: This officer has an enterocolitis, chronic, moderate, cause undetermined. He is definitely showing signs of improvement at this time and I daresay that there will be further improvement. Six months temporary limited duty is recommended.
The Disposition Board made the following diagnosis:
(1) Enterocolitis, chronic, moderate, cause undetermined.
Line of Duty — Yes. Condition on Completion of Case — Improved.
(2) Hay fever, moderate, due to ragweed.
Line of Duty — No, EPTS. Condition on Completion of Case — Unchanged.
(3) Ehinitis, chronic, allergic, moderate due to mixed allergens.
Line of Duty — No, EPTS. Condition on Completion of Case — Unchanged.
The Disposition Board made the following recommendation :
Captain Harold Grubin, formerly classified in a limited service status, be returned to duty in a limited service status, for a period of 6 months, at the expiration of which period (25 Sept.) he will be returned to an appropriate medical facility for reconsideration of his physical capacity for military duty.
13. (a) After a 30-day leave, plaintiff was ordered to the Station Hospital, Staten Island, New York, where he served in a limited duty status as chief of surgical services from May 4,1946 to July IT, 1946, when he was ordered to Tilton *295 General Hospital, Fort Dix, New Jersey, for “evaluation of temporary limited duty prior to separation.”
(b) On July 26, 1946, plaintiff was admitted to Tilton General Hospital where the final summary medical report on plaintiff reads in pertinent part as follows:
medical history: * * * At the present time, he has 2 to 3 normal stools daily, no blood., mucous, no gastrointestinal symptoms. He is sent in from Sep Ctr because of TLD status.
laboratory studies : CBC, Urinalysis, serology, negative.
physical EXAMINATION: Negative.
course in hospital : Patient was observed and found to be asymptomous. Proctoscopic exam, negative. GI clearance given by gastrointerologist.
diagnosis : 1. Observation for colitis; no disease found. LD. Yes.
condition: 1. Unchanged.
(c) On July 30,1946, a Disposition Board at Tilton General Hospital met and made the following diagnosis:
1. Observation for colitis; no disease found. LD Yes. Condition: Unchanged.
2. Allergy, moderate, cause undetermined, manifested by hay fever, fall. LD No EPTS. Condition: Unchanged.
The board found that plaintiff became incapacitated for military duty on July 26, 1946, that plaintiff’s colitis originated in May 1945, was an incident to service, did not exist prior to entry on active duty, was not permanently aggravated by active duty, and that plaintiff had received maximum hospital benefit. The board stated (briefly in nontechnical language) that plaintiff’s disability was “Allergic-state”, and recommended that plaintiff “be returned to duty in a permanent limited military service status and that he be returned to the command jurisdiction of the Separation Center, Fort Dix, N.J., for appropriate administrative action * *
(d) On August 2,1946, plaintiff was discharged from Til-ton General Hospital, and on the next day he was ordered to terminal leave to be released from active duty not due to physical disability on September 15? 1946,
*296 (e) While plaintiff was at Tilton General Hospital, his brother who was then in the Philippines telegraphed plaintiff that he was afflicted with paralytic poliomyelitis and would arrive in the States for care at the Army Navy Hospital at Hot Springs, Arkansas; whereupon plaintiff waived appearance before a medical retirement board and requested the officer in charge of his ward to hasten the proceeding to get plaintiff out of the service so that he could meet his brother upon his arrival at Hot Springs.
14. On August 4, 1946, plaintiff filled out an application for appointment and on that date was appointed captain, Medical Corps, Officers’ Eeserve Corps. In the application plaintiff indicated that he was available for limited service duty.
15. (a) At the time of his release from active duty plaintiff felt that he could control his condition in civilian life with proper working hours, diet, and rest. He resumed the practice of medicine and surgery in Newark, New Jersey, but under the pressures of his practice his symptoms returned. These symptoms included frequent diarrheic bowel movements, accompanied by bleeding and abdominal pains which were aggravated by prolapse of the rectum through the narrow anus, all of which left him fatigued and in need of prolonged rest, sedation, and continuous low residue diet.
(b) Shortly after resuming his practice plaintiff abandoned his surgery practice because of the stress and his inability to pursue it in his condition. He continued in general practice. Subsequently, for the same reasons, plaintiff, upon the advice of another doctor who was treating him, gave up the general practice of medicine and became a pathologist so that he could minimize the stress and could regulate his activities, diet, and rest periods. The transition from the practice of surgery and general medical practice to the field of pathology was at a substantial financial sacrifice. Plaintiff testified that notwithstanding this transition and continuous medication, his symptoms have persisted, though marked by periods of quiescence and exacerbation, depending largely on the stress of the day; that his abdominal discomfort occurs every day and develops into a spasm about once *297 a week, and tbat his bowel movements are never less than four a day and on occasion occur as frequently as 10 a day.
16. On March 18, 1950, plaintiff filled out an Organized Reserve Corps Qualification Questionnaire in which he indicated that he was fit for limited service as major in the medical corps but did not desire active duty. Plaintiff further indicated that the military assignment for which he felt most suited in event of emergency was as a pathologist in a general hospital.
17. (a) A letter dated May 16,1951, from Dr. James Koch of Newark, New Jersey, to Dr. Joseph I. Echikson, a physician who treated plaintiff, reads as follows:
Fluoroscopic and radiographic examination of the gastro-intestinal tract reveals the following:
Routine fluoroscopic examination of the chest shows no evidence of any cardiac or pulmonary pathological process.
The esophagus reveals no filling defect and no esophageal hiatus hernia is present.
The stomach is of medium size and of normal mobility and separability. Peristalsis is active and emptying-rapid.
The duodenal bulb shows some irritability, but there is no evidence of deformity or any other sign of ulcer. The duodenal loop as well as the jejunum show no muco-sal alteration.
The study of the small intestinal tract revealed a normal mucosal pattern throughout, however, considerable intestinal hypermotility was noted with the barium reaching the cecum in less than 1 hour.
At the end of 8 hours the stomach and duodenum are empty and the head of the barium meal is in the distal transverse colon. The haustrations of the colon are exaggerated due to spasticity.
At the end of 24 hours the colon is irregularly filled showing again signs of spasticity.
The colon was further investigated by means of a barium enema. There was rapid filling of the colon particularly of the descending portion. This portion of the colon shows very shallow haustrations with a tendency towards tubularity suggesting fibrosis of the descending-colon. No serrations of the outline of the colon are demonstrable at this time.
*298 Following evacuation of the barium and insufflation of air in order to visualize a double contrast no definite ulceration of the mucosa can be demonstrated, however, the tubularity is believed to be the result of a long standing ulcerative colitis, which is not active at the present time.
CONCLUSION: Chronic ulcerative colitis involving the descending portion of the colon. The disease process is apparently quiescent at the present time.
(b) Plaintiff consulted other medical specialists and had numerous proctoscopic examinations, X-rays, and stool examinations.
18. On June 8,1951, plaintiff filled out a Reserve Officer’s Qualification and Availability Questionnaire in which he indicated that he was physically unfit for service. In response to a query regarding degree of mobilization availability, plaintiff indicated that he would need more than a year. In a report of a medical examination of the same date which was apparently made in connection with plaintiff’s availability, plaintiff’s defects which were listed included “mucous colitis, suspicion of ulcer, active colitis, descending colon, internal hemorrhoids, anal stricture.”
19. On July 19, 1951, plaintiff was discharged from his commissions in the Officers’ Reserve Corps and the Army of the United States because of his unavailability in the event of mobilization.
20. (a) On February 10, 1957, plaintiff filed with the Veterans Administration an application for compensation or pension in which plaintiff listed the nature of the diseases or injuries for which claim was made and the date each began, as follows:
1. Irritable Colon — started in Philippine Islands in 1945 and had a hemorrhoidectomy and amoebic and went to hospitals for all related disorders (and condition has persisted); was sent back on hospital ship and was discharged from hospital.
2. Hemorrhoidectomy
3. Amoebic dysentery.
4. Fistulectomy.
5. Colitis.
*299 (b) The Veterans Administration report dated April 18, 1957, of the medical examination of plaintiff for disability evaluation under “PreseNt ComplaiNt (Symptoms only, not diagnosis)” contains the following: “Frequent bowel movements. Eectal pain. Eectal bleeding. Abdominal cramps.”
(c) The Veterans Administration rating sheet of plaintiff dated June 11, 1957, reads in pertinent part as follows:
Jurisdiction: Original claim.
Issue S/C for rectal condition (claimed as irritable colon, hemorrhoidectomy, amoebic dysentery, fistulectomy and colitis.
Facts Induction examination was negative for any pertinent disorder. The records show that veteran received extensive intermittent treatment for a lower bowel condition manifested by colitis, fissures, hemorrhoi-dectomy, fistula and proctitis in service from 7/45 to 7/46. Separation examination notes history of this rectal trouble. Although amoebic dysentery was suspected in service this was not definitely proven after repeated hospitalization.
Current VA examination reports moderate internal hemorrhoids, narrowing of anal canal, multiple fissures, fistula and ano mild and irritable bowel with subacute inflammation. Amoebic dysentery is not shown. Veteran is a physician and treats himself and states he has frequent bowel movements with rectal bleeding and abdominal cramps, but blood count is within normal limits.
Discussion Veteran’s current lower bowel pathology described above is related to service on the evidence of record. This condition is more than 10% disabling and an evaluation of 30% is assigned for the entire lower bowel and rectal disability with its various manifestations and rating is by analogy with an ulcerative colitis moderately severe with frequent exacerbations. Amoebic dysentery is not currently shown.
*300 1.Incurred W II VE 1(a) Part I Par 1(a) 30% from 2/25/57
7399-7323 Residuals of hemorrhoidectomy with FISSURES, FISTULA, COLITIS AND IRRITABLE COLON.
35. amoebic dysentery not found on last exam — 4/18/57.
No combat
8-2507, 4/18/62.
21. (a) On October 21,1957, plaintiff filed an application with, the Army Board for Correction of Military Eecords. On the application form plaintiff indicated that he did not desire to appear before the board but that he would be represented by counsel, that he did not desire to have witnesses appear in person in support of his application, and that the army records of his medical history would suffice as evidence in support of his application. Plaintiff further stated:
I waived appearance before a medical retirement board because my brother had been flown back from the Philippines to Army Navy Hospital, Hot Springs Arkansas as paraplegic and I asked to be released to fly there. The Army complied with my request. I now wish to be reviewed for medical retirement.
I believe I should have been medically retired.
(b) A medical evaluation dated March 13,1958, made for the Surgeon General by the office of the Chief, Physical Standards Division of the Army, reads in pertinent part as follows:
1. Eecords in the case of Harold O. Grubin, 0330059, have been reviewed in this office.
2. Although the record indicates that applicant was treated for enterocolitis intestinal parasites, hemorrhoids, cryptitis and fistula while in service, a physical evaluation at Tilton General Hospital in _ July-August 1946 incident to his separation found no disease. There is no evidence that applicant was incapacitated at any time during or subsequent to his military service.
3. It is the opinion of this office that applicant presented no physical disability at the time of his separation which would have warranted his retirement from the service on a medical basis under the rules, laws, regulations and policies in effect at that time.
(c) On April 9, 1958, the Army Board for Correction of Military Eecords determined that insufficient evidence had *301 been presented, to indicate probable material error or injustice in plaintiff’s case. Accordingly, plaintiff’s application was denied and lie was so advised by letter dated April 22, 1958.
22. (a) At the trial plaintiff offered the testimony of three eminently qualified medical witnesses, Dr. Leo H. Siegel, a specialist in the field of gastroenterology, Dr. Joseph I. Echikson, a specialist in internal medicine, and Dr. James Koch, who is certified in diagnostic roentgenology by the American Board of Koentgenologists.
(b) Dr. Siegel, who had neither examined nor treated plaintiff, but who had studied the medical records in the case, testified at length in explanation of the various medical terms appearing in the records. He expressed the opinion that at the time plaintiff was in the service, he was suffering from multiple intestinal infection which began in May of 1945. Dr. 'Siegel was unable to state whether plaintiff’s infection continued until the time of his discharge, but said that “plaintiff’s symptoms would indicate a continuing dis-function, — in other words, a continuing altered function of the large intestine and rectum.” Dr. Siegel stated that reasonable tests were made by the Army to determine the existence of various diseases with which plaintiff might have been afflicted and that plaintiff’s affliction is a chronic disease of the stomach or intestines which has periods of remissions and exacerbations. Dr. Siegel had served in the Army Medical Corps for approximately 24 months as a battalion surgeon. He expressed the opinion that at the time plaintiff was discharged to inactive status (September 15, 1946) he was not able to perform full military duty (meaning) “serving in battle, leading in battle, or in plaintiff’s case, serving as surgeon in army hospitals on the battlefield any place in the world, under any climate, under any conditions, without even any limitation of hours.” Dr. Siegel also expressed the opinion that at the time plaintiff was discharged to inactive status, he was not able “to perform the full duties of an army hospital in surgical work, for example, in time of peace.”
(c) Dr. Echikson had treated plaintiff for allergies before he went into the service and saw plaintiff professionally in the fall of 1946 shortly after plaintiff’s discharge when he *302 complained of abdominal cramps. Dr. Ecliikson expressed the opinion that at the time plaintiff returned home from the service he was suffering from ulcerative colitis which is a disease, the cause of which is not known but which is the subject of theories as to its cause, including psychogenic factors, stress, after-battle fatigue, and other emotional factors. Dr. Echikson stated that prior to his military service plaintiff did not have any symptoms of ulcerative colitis, that when he examined plaintiff upon his discharge from service he had substantially the same conditions which were diagnosed in the medical board reports, and that plaintiff’s condition since his discharge has been substantially the same as it was at the time of his discharge.
(d) Dr. Koch had taken numerous X-rays of plaintiff’s gastro-intestinal tract since 1951. On each occasion Dr. Koch also made a fluoroscopic examination of the same area. He testified that in certain of his examinations of plaintiff he found abnormal spasticity in plaintiff’s colon which did not appear in X-rays taken of the same area while plaintiff was in the army hospital; and that plaintiff’s rest and sedation in the hospital might make a difference as to the spasms in the colon.
23. (a) At the trial defendant offered the testimony of two medical witnesses who were likewise eminently qualified, Dr. H. C. Harrell, an X-ray specialist and chief of radiology at Walter Reed Army Hospital, and Dr. Emmett L. Kehoe, chief of gastroenterology at Walter Reed Army Hospital.
(b) Dr. Harrell expressed the opinion that plaintiff’s colon, as depicted in X-rays taken in May 1951, was normal, although an X-ray picture taken of a patient with ulcerative colitis during a period of exacerbation appears different from an X-ray picture taken of the same patient during a period of remission.
He testified that ulcerative colitis is characterized by periods of exacerbation and remission. He also testified that ulcerative colitis is very rarely cured.
(c) Dr. Kehoe expressed the opinion that at the time of his discharge plaintiff suffered from an irritable colon syndrome; that “the diagnosis of functional colonic disorders and their differentiation from other conditions is probably *303 the most complex problem in gastroenterology”, and that the actual cause of plaintiff’s complaint was never really found.
24. At the time of plaintiff’s discharge on September IS, 1946, there were in effect:
(a) Army Regulation 40-15, October 29, 1946, entitled “Medical Department. Standards of Physical Examination for Commission or Warrant in Regular Army, National Guard of United States, Army of United States, and Organized Reserves,” providing in part:
Section /. PhelimiNart. Par. 1:
Purpose of standards; how construed. — a. The purpose of the standards of physical examination is to secure the greatest efficiency and uniformity in making physical examinations. Medical examiners should interpret the standards with discretion and not construe them too arbitrarily, the object being to procure individuals who are physically fit for the rigors of military service and who are expected to remain so for a reasonable period of years.
* * # Jji ‡
Section XIV. Abdomen.
* if: * ❖ *
Par. Jfi. Conditions which are causes for rejection.— * * *
$ $ $ $ $
d. Chronic diseases of the stomach or intestines.
* * *
*****
n. Proctitis, stricture, or prolapse of the rectum.
o. External or internal hemorrhoids if large in size or symptomatic.
p. Fistula in ano; ischiorectal abscess.
q. Fissure of the anus or pruritus ani.
r. Incontinence of feces.
(b) Army Regulation 40-100, April 8,1946, entitled “Medical Department. Miscellaneous Physical Examinations,” providing in part:
Par. 7. Limited service standards of officers and warrant officers for original appointment and extended active duty.
a. In periods of national emergency individuals may be accepted for original appointment or extended active *304 duty who do not meet the physical standards for general military service but who are physically qualified for limited military service.
(c) Army Regulation 140-5, June 17, 1941, entitled “Officers’ Reserve Corps,” providing in part :
Par. 10. Physical Examinations. — a. Of Whom Required. — Except where otherwise expressly provided, every applicant for appointment in the Officers’ Reserve Corps, and every Reserve officer qualifying for reappointment, retention, promotion, transfer, or active duty, as well as extensions of tour thereof, and upon relief from active duty, will be required to pass satisfactorily a physical examination of the scope prescribed by current War Department instructions.
b. Standards. — The physical standards will be those prescribed in AR 40-100 and 40-105 * * * supplemented by current War Department instructions.
o. Medical officers making physical examinations will in every case, complete WD AGO Form No. 63 or WD AGO Form No. 64 (Physical Examination for Flying) whichever is applicable.
(d) Army Regulation 605-10, May 26, 1944, entitled “Commissioned Officers — Officers Appointed in the Army of the United States,” providing in part:
Par. W. The physical standards for appointment and promotion, for retention of commission and for entry upon active duty of an officer appointed in the Army of the United States are those prescribed for Officers’ Reserve Corps in AR 40-100 and AR 40-105 and, when applicable, 40-110, all as supplemented or modified by current War Department instructions.
(e) Army Regulation 605-250, March 28, 1944, entitled “Army Retiring Boards,” providing in part:
Section IV, Par. SO. Incapacity, character of, etc. — a. Character. — Incapacity for service by reason of physical disability related to a permanent incurable disease, injury, or infirmity which prevents the reasonable fulfillment of the purpose of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation, orders, or custom of the service.
b. Permanency. — The physical disability, on account of which the board is authorized to find an officer incapable of performing the duties of his office must be *305 permanent: that is, such that the removal, of the disability within a reasonable time is highly improbable. If, however, the disease or injury is curable or of such character as to yield to treatment, even though a cure may require considerable time, the disability is not permanent. The test should be, is the disease or injury curable or incurable? If the disability is incurable within a reasonable time, the board should find the officer incapacitated.
* * * # ❖

Par. 87. Limited Service.

Definition of “limited service”. — A limited service officer is one who is disqualified under current physical standards for general military service, but who has been classified, following thorough physical examination, as physically fit for certain types of active military assignments commensurate with his physical qualifications.
(f) War Department Technical Manual TM 12-245, October 1,1945, entitled “Physical Reclassification, Retirement and Retirement Benefits for Officers,” providing in part:
GbNbeal. Chapter 1.

Par. 1-a, page 5:

Classification of officers for general or limited service, and hospitalization and disposition (including determination of eligibility for retirement benefits, in appropriate cases) of officers determined to be physically unfit for general service or for limited service will be governed by these instructions.
❖ # * * * #
Legal Background eor Retiring Boards. Chapter If. Par. £8, Page 51:

Nature of permanent incapacity for active service.

a. The entitlement of eligible military personnel to retirement benefits for disability must be predicated in part upon a finding by a retiring board that a disability exists within the meaning of the various statutes concerned. Thus in cases involving officers and warrant officers of the Regular Army the retiring board must initially determine the existence of “incapacity for active service” within the meaning of sections 1251 and 1252, Revised Statutes (10 U.S.C. 933-4). In cases involving officers, warrant officers and flight officers who are not officers of the Regular Army the retiring board must decide whether such individuals have incurred a “disability” within the meaning of section 5 of the act *306 of 3 April 1939 (53 Stat. 557), as amended (10 U.S.C., Sup. I v, 456), that is, a permanent incapacity for active service. * * *
'b. The word “disability” as used in section 5 of the act of 3 April 1939, as amended, with respect to retirement pay 'benefits means such disability as would constitute a basis for the retirement of Regular Army Officer personnel. Thus, what constitutes “incapacity for active service” for Regular Army officers likewise constitutes “disability” for officers who are not Regular Army officers.
c. The question whether an officer of the Regular Army is incapacitated for active service is one of fact. An officer is incapacitated for active service when he is permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited service with the supply arms and services does not prevent his retirement under section 1251, Revised Statutes, supra, by reason of being permanently incapacitated for active service.
d. Incapacity for active service is a permanent condition, resulting from an incurable disease, injury or infirmity of such a character as to prevent the reasonable fulfillment of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation, orders or custom of the service. * * *
Retiring Board Procedures. Chapter 5.
$ $ ‡ ‡ $

Instructions for Answering Item 83, WD AGO Form 199, Par. 60a, Item 23, page 118:

[Item 23. State * * * Whether He Is or Is Not Permanently Incapacitated por Active Service.]
(1) The incapacity for active service must be permanent. An incapacity for active service is permanent if its removal within a reasonable time is highly improbable. However, if a disease, injury or infirmity is curable within even a considerable time the incapacity for active service which results therefrom is not permanent. Whether a disease, injury or infirmity is curable or incurable is a question of fact which must be decided by a retiring board on the basis of the medical evidence produced at the hearing. Ordinarily officers will not appear before a retiring board until they have received adequate medical treatment, thus medical witnesses may *307 be expected to express the opinion in many cases that a disease, injury or infirmity which has not been cured by the time of the hearing and will not be cured within approximately a year, is incurable within a reasonable time.
(2) Subject to the exceptions stated in (3), (4), and (5) below, an officer is permanently incapacitated for active service when, he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent a finding that he is incapacitated for active service. With respect to such an officer active service means general service. In considering such a case retiring boards will give due regard to the provision of Army Eegulations 40-100 and 40-105 which set forth the physical standards for the commission and appointment of commissioned officers, warrant officers and flight officers for general military service. However, the mentioned regulations will not be as strictly interpreted as for appointment or entrance on active duty. Thus officers may be found capable of performing active (general) service even though they have diseases, injuries or infirmities which would disqualify them for original appointment, provided such diseases, injuries or infirmities are of such a nature and degree as not to affect adversely the performance of active (general) service (including oversea duty) considering the individual’s age, grade, branch and military occupational specialty. Appropriate consideration will also be given to a record of satisfactory performance of general service over a reasonable period of time.
(3) An officer placed in the administrative status of permanent limited service when he entered on active duty, is permanently incapacitated for active service if he thereafter sustains a permanent disability as the result of a new disease, injury or infirmity of such a degree as would be of itself incapacitating for active (general) service.
* ‡ ‡ ‡

Instructions for Answering Item @6, ~WD AGO Form 199.

Par. 60(1(1), page 116:

* * * the date of incapacity for active service will be the date an officer becomes permanently physically or *308 mentally incapacitated for the reasonable performance of full military duty, field as well as garrison, in both peace and war.
*****
Instructions for Answering Item 34, WD AGO Form 199, page 120.

Par. 60h, Item 31¡.. Recommendations for Type of Service, If Any:

(1) When a retiring board is of the opinion that an officer appearing before it is capable of performing limited service, the board is authorized to recommend that he be considered for a limited service assignment.
(2) An officer is capable of performing limited service if he is physically fit for certain types of active military assignment commensurate with his physical condition even though he is disqualified under current physical standards for general military service.
(3) The recommendation of a retiring board that an officer be considered for a limited service assignment is not inconsistent with a finding of incapacity for active service and does not preclude his retirement or certification for retirement pay.
$ ‡ ‡ ‡ $

Par. Hpage 19:

Action of disposition board, a. Authorized recommendations. Upon completion of observation and treatment at a medical facility authorized the prerogative of physical reclassification, a disposition board will make appropriate recommendation for disposition of the officer as follows:
(1) To return to duty for general military service.
(2) To return to duty for general military service, with waiver of a physical defect nonprogressive in character and of such a slight degree as not to affect adversely performance of full duties appropriate to the officer’s grade and branch.
(3) To return to duty in a permanent or temporary limited service status provided the officer is physically capable of efficient performance of limited service duties.
(g) War Department Circular 313, dated October 12,1945 (effective until its rescission by Circular 303, Par. 24, October 9,1946), providing:
1. Applicability, a. Classification of officers for general or limited service, and hospitalization and disposition of *309 officers determined to be physically unfit for general service or for limited service, will be governed by this circular. * * *
# ❖ * ❖ *
2. Limited Service Status, a. Physical standards for commission and appointment of officers, warrant officers, and flight officers for active (general) military service are set forth in AE 40-105 and 40-100 * * *.
5. Due regard will be given to the provisions of the above-mentioned regulations in considering the physical qualifications of officers for retention on active (general) service. However, in this connection, the mentioned regulations will not be as strictly interpreted as for appointment or entrance on active duty.
g. Thus, officers may be found capable of performing active (general) service, even though they have diseases, injuries, or infirmities which would disqualify them for original appointment, provided such diseases, injuries, or infirmities are of such a nature and degree as not to affect adversely the performance of active (general) service (including oversea duty) considering the individual’s age, grade, branch, and MOS.
d. Appropriate consideration will also be given to a record of satisfactory performance of general service over a reasonable period of time.
$ ^ Í
8. Disposition op Oppicers Subsequent to Appearance Before a Disposition Board.
c. When the officer is recommended for permanent limited service and he—
(1) Does not desire to remain on active duty in a permanent limited service status, or
(2) Has been certified as nonessential as provided in paragraph 5, the commanding officer will order the officer before the appropriate Army retiring board without reconvening the disposition board. If the officer is recommended for permanent limited service and has been certified as essential as provided in paragraph 5, he will order the officer to the station of assignment obtained at the time of certification as to essentiality.
(h) The Manual for Officers in the Disposition and Retiring Board Branch of the Physical Standards Division of the Surgeon General’s Office, providing in part:

*310
Par. 49, page 15:

Tropical Fevers and various parasitic infections and various protozoa infections {Dysenteries), per se, will not be considered incapacitating for active service. The residuals of these infections will be the determining factors as to the officer’s incapacity. Transfer of the officer to a tropical medical center may be indicated.
25. The determination of the Correction Board, in April 1958, was contrary to the governing regulations and unsupported by substantial evidence.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c) (2).

 Shigellosis means an infection by a bacterium known as a shigella, which Is the cause of bacillary dysentery.